
# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | **98 C 8080** | **DATE** | **MAY 26, 2000** |
| **CASE TITLE** | GARY TOWNSEND AND ALEX RILEY v. PAUL VALLAS, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion for summary judgment [29-1] is granted in part and denied in part. The claims of plaintiff Riley are dismissed. Plaintiff Townsend's retaliation claim is dismissed. A settlement conference is set for June 14, 2000 at 10:00 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | **2** number of notices |
| ✓ | Notices mailed by judge's staff. | MAY 30 2000 date docketed |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | docketing deputy initials |
| | Mail AO 450 form. | 5/26/2000 |
| | Copy to judge/magistrate judge. | date mailed notice |

Document Number **37**

courtroom deputy's initials WJS

Date/time received in central Clerk's Office

MQM
mailing deputy initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

MAY 3 0 2000

GARY TOWNSEND and )
ALEX RILEY, )
)
            Plaintiffs, )
)
    v. )   No. 98 C 8080
)
PAUL VALLAS, MARILYN JOHNSON, )
and CHICAGO SCHOOL REFORM )
BOARD OF TRUSTEES, a municipal )
corporation, a/k/a Board of )
Education of the City of Chicago, )
)
)
            Defendants. )

## MEMORANDUM OPINION AND ORDER

      This case involves two Chicago public school employees
who were disciplined after a student drowned at their school.
Plaintiff Gary Townsend is a tenured teacher who teaches physical
education. Plaintiff Alex Riley was employed as a lifeguard and
swimming coach. One defendant is the Chicago School Reform Board
of Trustees (the "Board"), the school board for Chicago public
schools. Named as defendants in their individual capacity are
Paul Vallas, who is the Board's Chief Executive Officer, and
Marilyn Johnson, the head of the Board's Law Department.

      Plaintiffs bring the following claims, each of which is
against all three defendants. Riley claims he was denied a

liberty interest without due process in that he was stigmatized by the accusations that he caused the student's death, but was not provided with an adequate opportunity to respond to the accusations.[1]  Townsend claims he was denied procedural due process based on a property interest in his tenured position and not being provided with a timely hearing that would have enabled him to return to a teaching position.  Townsend also claims he was retaliated against for attempting to exercise his constitutional right to a hearing.  Presently pending is defendants' motion for summary judgment.

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant.  Schneiker v. Fortis Insurance Co., 200 F.3d 1055, 1057 (7th Cir. 2000); Baron v. City of Highland Park, 195 F.3d 333, 337-38 (7th Cir. 1999).  The burden of establishing a lack of any genuine issue of material fact rests on the movant.  Wollin v. Gondert, 192 F.3d 616, 621-22 (7th Cir. 1999); Essex v. United Parcel Service, Inc., 111 F.3d 1304, 1308 (7th Cir. 1997).  The nonmovant, however, must make a showing sufficient to establish any essential element for which he will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Shank v. William R. Hague, Inc., 192 F.3d 675, 681 (7th

---

[1]Riley does not seek a name-clearing hearing; he prays for damages.  Townsend's liberty interest claim was previously dismissed.  See Townsend v. Vallas, 1999 WL 409996 *4-5 (N.D. Ill. June 7, 1999).

Cir. 1999); <u>Wintz v. Northrop Corp.</u>, 110 F.3d 508, 512 (7th Cir. 1997). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. <u>Celotex</u>, 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. <u>See</u> <u>NLFC, Inc. v. Devcom Mid-America, Inc.</u>, 45 F.3d 231, 236 (7th Cir.), <u>cert. denied</u>, 515 U.S. 1104 (1995); <u>Covalt v. Carey Canada, Inc.</u>, 950 F.2d 481, 485 (7th Cir. 1991); <u>Collins v. Associated Pathologists, Ltd.</u>, 844 F.2d 473, 476-77 (7th Cir.), <u>cert. denied</u>, 488 U.S. 852 (1988). As the Seventh Circuit has summarized:

> The moving party bears the initial burden of directing the district court to the determinative issues and the available evidence that pertains to each. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>id.</u> at 325 ("the burden on the moving party may be discharged by 'showing'-- that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case"). Then, with respect to issues that the non-moving party will bear the burden of proving at trial, the non-moving party must come forward with affidavits, depositions, answers to interrogatories or admissions and designate specific facts which establish that there is a genuine issue for trial. <u>Id.</u> at 324. The non-moving party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to

> interrogatories or admissions that establish that
> there is a genuine triable issue. Id. The
> non-moving party "must do more than simply show
> that there is some metaphysical doubt as to the
> material facts." Matsushita Elec. Indus. Co. v.
> Zenith Radio Corp., 475 U.S. 574, 586 (1986).
> "The mere existence of a scintilla of evidence
> in support of the [non-moving party's] position
> will be insufficient; there must be evidence on
> which the jury could reasonably find for the
> [non-moving party]." Anderson v. Liberty Lobby,
> Inc., 477 U.S. 242, 252 (1986).

Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992).

Resolving all factual disputes and drawing all reasonable inferences in plaintiffs' favor, the facts assumed to be true for purposes of summary judgment are as follows. Vallas has been the Chief Executive Officer of the Board since 1995. The Board does not dispute that he is a policymaking official. Johnson's present title is General Counsel of the Board. She has been the head of the Law Department since 1996.[2] From 1993 until his 1998 discharge that is a subject of this lawsuit, Riley was a part-time lifeguard and swimming coach at Julian High School. His position was not subject to tenure or other similar civil service protections. Townsend is a tenured physical education instructor. During the 1997-1998 school year, he was assigned to a position at Julian High School. He was also assigned to coach fall, winter, and spring extracurricular sports. The coaching positions entitled Townsend to additional income beyond his

---

[2]Her prior title as head of the Law Department was "Attorney."

teacher's salary, but the coaching positions themselves were not protected by tenure.

On April 14, 1998, Townsend taught a seventh period swimming class to freshmen students. Riley was responsible for lifeguard duties for that class and Lloyd Wilson was one of the students in that class. The class ended at 2:28 p.m., at which point students would have been dressed and should have proceeded to their eighth period classes. Townsend and Wilson were the last known adults to see Wilson alive.

On April 15 at approximately 8:00 a.m., Townsend and several students found Wilson on the bottom of the pool. Wilson was dead. There is no conclusive evidence as to how Wilson ended up where he was found. Two possible explanation are that (a) he drowned during the seventh period swimming class, but no one noticed and (b) he surreptitiously returned to the pool after the seventh period and drowned when nobody else was at the pool. Plaintiffs point to evidence that, at the conclusion of the seventh period class, they conducted an adequate inspection of the pool and lockers such that they would have discovered Wilson in the pool or locker room if he were there. Also, some students stated in investigative interviews that they saw Wilson leave the pool at the end of the class. On defendants' summary judgment motion it must be assumed that plaintiffs were not negligent in performing their duties and that Wilson surreptitiously returned to the pool after the class. It is a distinct issue, though, as to what information defendants had when they took action, whether

they acted in good faith, and whether they failed to provide plaintiffs with any required procedures.

Shortly after the discovery of Wilson's body, Vallas and Johnson and other Board officials learned of the drowning. Acting on behalf of the Board, Johnson retained Martin Boyer Company to investigate the drowning. The same morning, Riley was told not to report to Julian until further notice. He never again received notice to report there or to any other Board facility. When events relating to student safety occur and the conduct of a teacher is in question, Board policy is to remove the teacher from the school and place him or her, at least temporarily, in the Central Office of the Board. On April 15, Townsend was reassigned to the Central Office, where he sat at a desk. He was occasionally asked to make a telephone call and to pack boxes for a move. He continued to receive the same regular pay, but no additional pay for coaching. Townsend remained at the Central Office until February 8, 1999, at which time he returned to teaching at Julian. At that time or shortly thereafter, he resumed coaching duties as well. During the summer of 1998, Townsend was not required to report to the Central Office, just as he would not have been required to report to Julian during the summer.[3]

---

[3]In ¶ 17 of Plaintiffs' Rule 56.1(b)(3)(A) Statement, Townsend contends that he was denied the opportunity to work during the summer. However, since he provides no record citation to support this contention, it is not taken into consideration in ruling on summary judgment. See N.D. Ill. Loc. R. 56.1(b)(3)(A); Garrison v. Burke, 165 F.3d 565, 567 (7th Cir. 1999); Valenti v.

Within two weeks after the drowning, the Board received both the Martin Boyer report (the "Boyer Report") and an investigation report of the Chicago Police Department (the "Police Report"). Both reports contain summaries of numerous interviews with faculty, students, and maintenance employees. The Boyer Report specifically notes that its author was unable to interview Townsend, who had been hospitalized after the incident because of stress. The Police Report contains a summary of an interview of Townsend. The Boyer Report includes an assessment of the investigation. The Police Report contains no overall summary or conclusions.

Both reports disclose that a number of students reported seeing Wilson get out of the pool and/or rinse off outside the pool. No students reported seeing Wilson in any distress during the swimming class or seeing him still in the pool at the end of class. The Boyer Report summarizes interviews with three teachers who walked along the pool after the seventh period class and did not notice anyone in the pool. The Police Report summarizes an interview with one of these teachers.

Riley was interviewed for both reports.[4] He recalled finding Wilson's identification badge and some clothes near the

Qualex, Inc., 970 F.2d 363, 369 (7th Cir. 1992); Skagen v. Sears, Roebuck & Co., 910 F.2d 1498, 1500 (7th Cir. 1990).

[4]The Boyer Report refers to an interview of Riley and an attached summary. No such summary is contained in the copy provided to the court, which is missing page 3. It is assumed that its contents correspond with the assessment section and Riley's reported statement to the Police.

pool.  Some of the student interviewees and Townsend's reported
interview corroborate that clothes were found.  Riley stated that
he searched the pool area immediately after finding the clothes
and again before leaving.  Townsend reported to the police
investigator that he also checked the pool before leaving.

The assessment section of the Boyer Report includes the
following statements.

> The investigation to date does not provide
> any specific answers to the questions as to how
> the student died, or why the body was not
> discovered until the next day.  It seems the
> student died sometime during, or after the
> seventh period swimming class. . . .
>     . . . The life guard claims to have
> followed all procedures and checked the pool,
> before securing the area.  The only problem
> is he does admit to finding a pile of clothes in
> the area of the pool after the class.  These
> later were found to be those of the deceased.
> He claims to have asked the teacher about this
> and was informed to leave them, and someone will
> come and get them.
>     The case is really in two areas[:]  one the
> death, and second the delay in finding the body.
> Both are unexplained at this time.  The first may
> never be known.  There is no one who ever saw the
> student in any type of distress, or trouble in
> the water.  The cause of the death, and time,
> cannot be determined. . . .  The checking of the
> pool area, except for the clothing, was not
> unusual.  It seems the body was most likely in
> the pool and no one looked with the degree of
> concern to see it.
>     . . . The life guard, if he is to be
> believed,did not see the body in the pool, and
> therefore did not perform his duties as expected.
> He is to confirm the area is clear, and more than
> clean should be looking for ANYTHING in the pool.
> His conduct related to the clothing is not
> correct when only students were in the pool area,
> and if clothes were found then either a student

is still in the area, or a student went to class without clothes.

On May 6, a week or so after receiving the two reports, Johnson was interviewed by a Chicago Sun-Times reporter. No evidence is presented that she had any significant information about the drowning incident other than the two reports that she received. As reported in the subsequent article, Johnson announced that she had recommended that Townsend be suspended without pay for 30 days and that Riley no longer be employed by the Board, both for "failure to perform duties."

As of April 1998, Riley was also a swimming teacher for the City Colleges of Chicago. He continues to be employed in that position. He has not made any attempt to replace the part-time employment he had with the Board. He did make an inquiry about returning to work at Julian and it was made clear to him that he could not work for any Board facility. No hearing has ever been held regarding Riley's dismissal.

Townsend was reassigned to the Central Office, but never actually suspended. On June 10, 1998, he was served with a notice of charges seeking a 30-day suspension. Vallas and Johnson were responsible for issuing the charges. A hearing was set for June 12, 1998. Townsend appeared on that date with his attorney, but the Board sought a continuance because it was not prepared to go forward. The hearing was reset to July 24, but he

Board was again unprepared to proceed on that date.  The Board decided to postpone the hearing until after discovery was completed in a wrongful death action brought by Wilson's estate. On July 24, the Board promised to return Townsend to teaching duties when the school year started in late August.  However, Townsend was not allowed to return to teaching until February 8, 1999.

During the summer of 1998, Townsend, through his attorney, was seeking to be returned to his position at Julian. When the school year began without his having returned, Townsend's attorney sent Johnson a letter contending that Townsend was being denied property without due process and demanding he be immediately returned to Julian.  The letter was received at the Law Department on August 27, 1998.  Defendants contend that they did not return Townsend to teaching that fall because there was instability at Julian and they did not want to cause further problems by potentially adding his return to the mix of complaints.  Evidence supports this explanation, but it is not conclusive.  The other problems were unrelated to the drowning incident and it is not clear that the situation was significantly different in February when Townsend was permitted to return.

The charges against Townsend still remain pending, but no hearing has yet been held and no hearing is presently

scheduled.  Also, the proposed suspension has not yet been imposed.

Riley's liberty interest claim will be considered first. By itself, defamation by a public official is not a constitutional tort because it does not implicate a protected liberty or property interest.  Paul v. Davis, 424 U.S. 693, 701 (1976); Olivieri v. Rodriquez, 122 F.3d 406, 408 (7th Cir. 1997), cert. denied, 522 U.S. 1110 (1998).  However, when the character and circumstances of the defamation are such as to foreclose the freedom to take advantage of other employment opportunities, the defamed person's liberty interest in his or her employment or occupation is implicated.  Olivieri, 122 F.3d at 408 (quoting Paul, 424 U.S. at 710).  This is true even absent a property interest in the position of public employment.  Harris v. City of Auburn, 27 F.3d 1284, 1286 (7th Cir. 1994).  To succeed on his damages claim, Riley must show "(1) [he] was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed, and (3) [he] suffered a tangible loss of other employment opportunities as a result of public disclosure." Strasburger v. Board of Education, Hardin County Community Unit School District No. 1, 143 F.3d 351, 356 (7th Cir. 1998), cert. denied, 525 U.S. 1069 (1999); Harris, 27 F.3d at 1286; Johnson v. Martin, 943 F.2d 15, 16 (7th Cir. 1991); Townsend v. Vallas, 1999 WL 409996 *4 (N.D. Ill. June 7, 1999).  Defendants contend that

the undisputed facts show that Riley does not satisfy the first and third elements.

Defendants contend the first element is not satisfied because Riley cannot point to anyone who has a lower opinion of him as a result of the claimed stigmatization. "The first element requires the employee to show that a public official made defamatory statements about him." Strasburger, 143 F.3d at 356. The statement must be shown to be factual in nature and false and must be shown to have come from the mouth of a public official. Id. Also, the statement must sufficiently stigmatize the employee's good name, reputation, honor, or integrity. See Townsend, 1999 WL 409996 at *4. Defendants point to no case holding that satisfaction of the first element requires a showing that a third party's opinion of the plaintiff was lowered as a result of the defamatory statement. It is the third element that concerns the effects of the stigmatization.

Defendants do not argue that the first element is not satisfied because the statements are true or cannot be attributed to defendants. In any event, as previously discussed, genuine factual disputes exist regarding Riley's responsibility for Wilson's death. It is undisputed that Johnson made the statements and Vallas does not deny joining in the statement or otherwise being responsible for it. Since Vallas is a policymaking official, that would make the Board responsible as

well.[5]  On defendants' motion to dismiss, it was held that the
alleged statements were sufficiently stigmatizing to satisfy the
first element.  See Townsend, 1999 WL 409996 at *4-5.  As stated
there, "Negligent conduct that causes a student's death is a very
serious charge against a school employee.  Short of intentionally
killing a student, there are few charges that would be more
serious.  Moreover, Riley was a lifeguard, a person especially
responsible for preventing injury or death at a swimming pool."
As regards the actual defamatory statement, the facts assumed to
be true on summary judgment are not materially different from
those alleged in the complaint.  In a footnote without supporting
argument, defendants assert that stating Riley's employment was
terminated for "failure to perform duties" is not a direct
accusation that he was to blame for Wilson's death.  The
implication, however, is clear; it would be difficult to hear
Johnson's statement without coming to the understanding that she
was blaming Riley and Townsend for Wilson's death.  Defamatory
statements need not be direct and explicit; they may be implied.
See Strasburger, 143 F.3d at 356; Milsap v. Journal/Sentinel,
Inc., 100 F.3d 1265, 1268 (7th Cir. 1996).  Riley satisfies the
first element of his claim.

_____

    [5]In any event, since the claim is otherwise being
dismissed for failure to satisfy the third element, questions as
to which defendant or defendants should be held responsible are
of no import.

Defendants contend the third element is not satisfied because Riley cannot point to any employment opportunity that he sought and for which he was turned down because of the stigmatizing statements. The third element requires a showing that prospective employment opportunities have been foreclosed. Munson v. Friske, 754 F.2d 683, 694 (7th Cir. 1985). Here, plaintiff was not discharged from the swimming teacher position he had with the City Colleges and he did not apply for any positions for which he was turned down. Since he cannot satisfy the third element, Riley's liberty interest claim fails. Fittshur v. Village of Menomonee Falls, 31 F.3d 1401, 1409-10 (7th Cir. 1994); Ohse v. Hughes, 816 F.2d 1144, 1150 (7th Cir. 1987), vacated on other grounds, 485 U.S. 902 (1988), opinion after remand reinstates pertinent holding, 863 F.2d 22, 24 (7th Cir. 1988); Landsee-Huschitt v. City of Crystal Lake, 1998 WL 812403 *5 (N.D. Ill. Oct. 29, 1998); Francis v. City of Crystal Lake, 1998 WL 744054 *5 (N.D. Ill. Sept. 29, 1998); Sommer v. Oak Brook Park District Board of Park Commissioners, 1996 WL 422152 *11 (N.D. Ill. July 24, 1996); Drillis-Eizis v. Village of Orland Hills, 1995 WL 88800 *7 (N.D. Ill. March 1, 1995); Lewis v. Illinois Department of Children & Family Services, 1994 WL 270265

*2-3 (N.D. Ill. June 15, 1994). Riley's claim will be
dismissed.[6]

Townsend's due process claim will be considered next.
There is no dispute that, as a tenured teacher, he had a property
interest that is protected by due process. There is also no
dispute that his coaching assignments were not tenured and do not
otherwise meet the requirements for being a property interest.
The only pay that Townsend lost during the dispute was his loss
of pay from coaching assignments. Defendants contend the due
process claims should be dismissed because Townsend did not lose
any teacher pay. Plaintiff contends that his assignment to the
non-teaching position in the Central Office is a sufficient
deprivation to support his due process claim.

In resolving this issue, it is important to identify the
particular property interest involved. In this case, state law
establishes the property interest. See Pleva v. Norquist, 195
F.3d 905, 913 (7th Cir.), cert. denied, 459 U.S. 1017 (1999);
Dusanek v. Hannon, 677 F.2d 538, 542 (7th Cir.), cert. denied,
459 U.S. 1017 (1982). Under Illinois law, a Chicago teacher who
has served the probationary period, that is a tenured teacher
such as Townsend, may not "be removed except for cause." 105

---

[6]Since Riley's claim is closely related to Townsend's
claims, including Townsend's previously dismissed liberty
interest claim, this is not an appropriate case for entering a
partial judgment as to Riley's cause of action. See Fed. R. Civ.
P. 54(b).

ILCS 5/34-85.  See also id. § 5/34-84 (after completing
probationary period "appointments of teachers shall become
permanent subject to removal for cause in the manner provided by
Section 34-85").  Since cause was required for his removal,
Townsend had a property interest in his teaching position.  See
Staples v. City of Milwaukee, 142 F.3d 383, 385 (7th Cir. 1998);
Patkus v. Sangamon-Cass Consortium, 769 F.2d 1251, 1263 (7th Cir.
1985); Dusanek, 677 F.2d at 542.

The statute does not expressly define what is meant by
"removed."[7]  In construing "removed" as used in the tenure
statutes, the Illinois courts have construed it in light of the
purposes of the tenure provisions, which "is to assure teachers
of experience and ability a continuous service and rehiring based
upon merit rather than failure to be rehired for reasons that are
political, partisan or capricious."  Hansen v. Board of Education
of School District No. 65, 150 Ill. App. 3d 979, 502 N.E.2d 467,
471 (2d Dist. 1986).  See also Birk v. Board of Education of
Flora Community Unit School District No. 35, Clay County,
104 Ill. 2d 252, 472 N.E.2d 407, 409 (1984); Deem v. Board of

---

[7]Although, the Illinois School Code was substantially
revamped in 1995, removal for cause has been a provision for a
number of years.  See Ill. Rev. Stat. ch. 122, ¶ 34-85 (1961);
Ill. Rev. Stat. ch. 122, ¶ 186 (1937); Ill. Rev. Stat. ch. 122,
¶ 161 (1909).  The term "removed" or "removal" is also used in
tenure provisions applicable to Illinois public school systems
other than the one in Chicago.  See 105 ILCS 5/24-12.  See also
Ill. Rev. Stat. ch. 122, ¶ 24-12 (1961).

Education of Triad Community Unit School District No. 2, Madison County, 200 Ill. App. 3d 903, 558 N.E.2d 291, 292 (5th Dist. 1990); Caviness v. Board of Education of Ludlow Community Consolidated School District No. 142 of Champaign County, 59 Ill. App. 3d 28, 375 N.E.2d 157, 158-59 (4th Dist. 1978). Case law establishes that removal is not limited to meaning only complete termination of employment by the particular school board. Birk, 472 N.E.2d at 408-09; Hansen, 502 N.E.2d at 472 (quoting Caviness, 375 N.E.2d at 158). Removal ordinarily does not include transfers or reassignments. See Bart v. Board of Education of Chicago, 256 Ill. App. 3d 880, 632 N.E.2d 39, 41-42 (1st Dist. 1993), appeal denied, 155 Ill. 2d 561, 633 N.E.2d 1 (1994) (transfer of assistant principal to teacher position was not a removal because plaintiff was certified as a teacher, not as an assistant principal); Newby v. Board of Education, Lake Zurich Community Unit School District, No. 95, 53 Ill. App. 3d 835, 368 N.E.2d 1306, 1307 (2d Dist. 1977) (transfer of guidance counselor to teacher position); Lane v. Board of Education of Fairbury-Cropsey Community Unit School District No. 3, 38 Ill. App. 3d 742, 348 N.E.2d 470, 472 (4th Dist. 1976) (transfer of principal to teacher position was not a removal where there was no certification as a principal that was distinct from certification as a teacher); Van Dyke v. Board of Education of School District No. 57, Cook County, 115 Ill. App. 2d 10, 254

N.E.2d 76, 79-81 (1st Dist. 1969) (same); Danno v. Peterson, 421 F. Supp. 950, 951-53 (N.D. Ill. 1976) (transfer of administrator to teaching position was not a removal since he remained in a certified position); Lester v. Board of Education of School District No. 119 of Jo Daviess County, 87 Ill. App. 2d 269, 230 N.E.2d 893, 898-99 (2d Dist. 1967) (transfer of superintendent to teaching position was not a removal because certification was as a teacher); People ex rel. McCoy v. McCahey, 296 Ill. App. 310, 15 N.E.2d 988, 992-93 (1st Dist. 1938) (transfer of principal from a high school to an elementary school is not a removal). However, a transfer or reassignment must be "bona fide and not in the nature of chicanery or subterfuge designed to subvert" tenure laws. Owen v. Board of Education of Kankakee School District No. 111, 261 Ill. App. 3d 298, 632 N.E.2d 1073, 1077 (3d Dist. 1994) (quoting Lester, 230 N.E.2d at 898); Lane, 348 N.E.2d at 472-73; Van Dyke, 254 N.E.2d at 81. See also Caviness, 375 N.E.2d at 159 (a school board cannot "nibble away and reduce" a teacher's position until economic necessity forces a resignation). Reductions in the hours worked constitute a removal. Birk, 472 N.E.2d at 408-09; Caviness, 375 N.E.2d at 158-59. More importantly, a transfer out of a position requiring teacher certification[8] is a removal that requires cause. Hansen,

---

[8]At the times pertinent to this lawsuit as well as currently, Chicago public school teachers were required to be certified. See 105 ILCS 5/21-1. See also id. § 5/34-83.

502 N.E.2d at 472. See also Bart, 632 N.E.2d at 42 (tenure is as a certified employee); Newby, 368 N.E.2d at 1307 (same); Lane, 348 N.E.2d at 472 (same).

In Hansen, the plaintiff was a certified music teacher who was reassigned to a proctor position, monitoring children disembarking and embarking the busses and monitoring the lunchroom and study halls. His salary level was frozen, but it was not decreased. Although these were duties that were often assigned to teachers to perform along with their teaching duties, these were the plaintiff's only assigned duties. The plaintiff was not assigned any teaching duties that were required to be performed by a certified teacher. Id., 502 N.E.2d at 470. The Illinois Appellate Court held that this constituted assignment to a position not requiring certification and therefore constituted removal or dismissal under Ill. Rev. Stat. ch. 122, ¶ 24-12. "We do not find that any assignment by the board of an activity that could be construed as extracurricular or outside of a teacher's

---

Principals also must be certified. See id. § 5/34-8.1. For Chicago public school teachers, certification as a teacher is distinct from certification as a principal or superintendent, as well as other certified positions. See id. § 5/34-84 ("As used in this Article, 'teachers' means and includes all members of the teaching force excluding the general superintendent and principals."); id. § 5/34-85 (separate provisions regarding removal of teachers for cause and removal of principals for cause); Bart, 632 N.E.2d at 41-42. See generally id. 5/21 (certification provisions).

primary teaching responsibilities constitutes dismissal or removal requiring the formalities of notice and a hearing, but only that here, the total deprivation of teaching responsibilities and assignments is the equivalent of a dismissal under 24-12." Hansen, 502 N.E.2d at 472.

As applied to the present case, Townsend had a property interest in being assigned to a certified teaching position. Being assigned to the Central Office without any teaching duties therefore constituted removal from his teaching position, a deprivation of his property interest. Because plaintiff had a property interest in a teaching position itself, that is he could not be transferred from a certified position absent cause, this case is distinguishable from those cases where suspensions, reassignments, or other adverse employment actions did not implicate a property interest. See, e.g., Duncan v. Wisconsin Department of Health & Family Services, 166 F.3d 930, 937 (7th Cir. 1999) (suspension with pay did not constitute deprivation of property because applicable law only required cause for suspensions without pay); Swick v. City of Chicago, 11 F.3d 85, 86-87 (7th Cir. 1993) (police officer being placed on sick leave with pay was not a removal, discharge, or suspension of more than 30 days which would have required cause and therefore was not a deprivation of property); Altman v. Hurst, 734 F.2d 1240, 1242 (7th Cir.), cert. denied, 469 U.S. 982 (1984) (under applicable

statute, discipline other than removal, discharge, or suspension did not require cause and therefore property interest was not implicated by imposition of different form of discipline).

In an alternative holding,[9] Swick, 11 F.3d at 87-88, concludes that, absent an economic impact on the plaintiff's employment, there is no cognizable due process claim. Swick reasons that, absent an economic impact, the intangible injury that occurs is de minimis and therefore not an appropriate circumstance for enforcing constitutional rights. "We do not think that 'property' within the sense of the amendment should be extended to the purely dignitary or otherwise nonpecuniary dimensions of employment." Id. at 87. Swick acknowledges, however, that pecuniary losses are not limited to the loss of wages or other direct compensation. It also includes indirect effects, such as effects on pensions, loss of promotional opportunities, or decreases in posttermination earnings. See id.

---

[9]Swick, 11 F.3d at 86-87, holds that Swick being placed on sick leave was not a loss of property because cause was not required to place Swick on sick leave. The opinion then states, "But even if this is wrong and Swick was suspended within the meaning of a statute that creates an entitlement not to be suspended for more than 30 days without cause, we do not think he has a claim under the Fourteenth Amendment." Id. at 87. The opinion then goes on to discuss the necessity of economic loss. Even if this were to be construed as dictum, not an alternative holding, a later Seventh Circuit case refers to it as a holding and follows it. See Crim v. Board of Education of Cairo School District No. 1, 147 F.3d 535, 546-47 (7th Cir. 1998). In any event, since plaintiff points to evidence of an economic loss, following this holding of Swick does not affect the merits of plaintiff's claim.

at 86-87.  Lost posttermination earnings may be income that would have been earned from third parties.  See Swick, 11 F.3d at 86 (citing Moskowitz v. Trustees of Purdue University, 5 F.3d 279, 282-84 (7th Cir. 1993)).  Lost promotions and lost income from third parties are not items in which the employee would have a protectible property interest, at least currently and vis-a-vis the then-current employer.  Thus, following Swick, the indirect economic loss need not be a source in which the plaintiff has a property interest.  Here, Townsend did not suffer any diminution in his teacher's salary itself.  Removing him from the school, however, also removed him from the opportunity to coach at Julian, which cost him the additional income that goes along with performing that duty.  Therefore, Townsend's removal to the non-teaching assignment at the Central Office resulted in a measurable pecuniary loss and therefore constituted a loss of constitutionally protected property.[10]

---

[10]Having suffered a pecuniary loss related to his employment, Townsend has suffered a loss of property even under the rule set forth in Swick.  Damages, however, would not necessarily be limited to his loss of earnings as a coach. Having lost property, and assuming due process was not provided, Townsend may also be entitled to compensatory damages for injuries such as emotional distress, humiliation, or mental anguish.  See Carey v. Piphus, 435 U.S. 247, 254-64 (1978); Dishnow v. School District of Rib Lake, 77 F.3d 194, 199 (1996); Smith v. Milwaukee County, 954 F. Supp. 1314, 1325 (E.D. Wis. 1997); Bauschard v. City of Chicago, 1995 WL 476658 *1 (N.D. Ill. Aug. 8, 1995).

Generally, before a public employee with a protectible property interest in his or her employment is dismissed, he or she is entitled to at least a limited pretermination hearing to be followed by a more comprehensive posttermination hearing to be held within a reasonably prompt period of time. See Cleveland Board of Education v. Loudermill, 470 U.S. 532, 543-47 (1985); Chaney v. Suburban Bus Division of Regional Transportation Authority, 52 F.3d 623, 628-29 (7th Cir. 1995). See also Gilbert v. Homar, 117 S. Ct. 1807, 1811 (1997). "The formality and the procedural requisites for the [pretermination] hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." Loudermill, 470 U.S. at 545 (quoting Boddie v. Connecticut, 401 U.S. 371, 378 (1971)). At a minimum, the employee is entitled to "notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed actions should not be taken is a fundamental due process requirement." Loudermill, 470 U.S. at 546.

Still, the particular circumstances must be considered in determining what process is due. This generally requires the balancing of three factors. "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute

procedural safeguards; and finally, the Government's interest."
Gilbert, 117 S. Ct. at 1812 (quoting Mathews v. Eldridge, 424
U.S. 319, 335 (1976)).  An employee has a substantial interest in
the uninterrupted receipt of pay.  However, a temporary
suspension of pay, where a sufficiently prompt postsuspension
hearing will be provided, is not as significant an interest as
longer interruptions without a hearing.  Gilbert, 117 S. Ct.
at 1813.  Gilbert holds that suspension without pay and without a
presuspension hearing will comport with due process when the
employee's conduct represents a significant danger and a prompt
postsuspension hearing is provided.[11]  Id. at 1814-15.

Dictum in Loudermill, 470 U.S. at 544-45, also indicates
that a suspension with pay followed by a termination hearing will
satisfy due process even without the pretermination hearing.
Although this statement has been recognized as dictum, see, e.g.,
Gilbert, 117 S. Ct. at 1811-12; Crim v. Board of Education of
Cairo School District No. 1, 147 F.3d 535, 546 n.25 (7th Cir.
1998), it has been treated as authoritative.  See, e.g.,
Levenstein v. Salafsky, 164 F.3d 345, 351 (7th Cir. 1998).

Here, Townsend was removed from his teaching position and
continued to receive the salary of a teacher.  Essentially, he

---

[11]Gilbert, 117 S. Ct. at 1813-14, also takes into
consideration that the employee had been indicted for the same
conduct, which decreased the likelihood of an erroneous
deprivation.

was suspended with pay. However, he was not being paid his full presuspension earnings since he was no longer earning his coach's pay. Cf. Lickiss v. Drexler, 141 F.3d 1220, 1221-22 (7th Cir.), cert. denied, 525 U.S. 1002 (1998) (during suspension Lickiss was paid the lower salary of a deputy sheriff, instead of the salary of a sergeant). Still, the coach's pay presumably represents a relatively small percentage of Townsend's annual income. Therefore, the private interest to be weighed in the balance is significantly less than in the situation where an employee is terminated or suspended with no pay whatsoever pending a hearing. It is closer to the situation of a temporary suspension considered in Gilbert. Furthermore, the Board had a significant interest in removing Townsend from the position he had been in pending an investigation, a student under his care had drowned to death. Also, the Board acted promptly in conducting its investigation of the incident. Balancing the factors involved, it was not a violation of due process to initially remove Townsend from his teaching position, with almost full pay, but without providing a preremoval hearing.

That, however, does not end the inquiry. Although Townsend's initial removal from teaching could be justified by concerns for student safety, defendants' position changed over time. Within a few weeks, it was determined that Townsend should, at most, be punished with a 30-day suspension. It was

not being claimed that, after serving the proposed suspension, it would not be safe for him to supervise students. Moreover, defendants contend that, as of the start of school in August 1998, their reason for not reinstating Townsend was fear of the reaction at Julian. Even if that reason were to be fully credited, it does not explain why Townsend could not be assigned to a teaching position at a different school. For these reasons, following the initial investigation, the balance of interests changed and no government interest remained that justified keeping Townsend out of a teaching position and at reduced earnings pending his hearing. On the present record, while continuing to await a hearing on the proposed suspension, Townsend should have been returned to a certified teaching position, at Julian or elsewhere in the school system.

Even if defendants had had adequate justification for keeping Townsend suspended pending a hearing, a due process violation is stated. A public employee with a protectible property interest who is suspended or terminated without pay is entitled to a sufficiently prompt postsuspension or posttermination hearing. Loudermill, 470 U.S. at 546-47; Gilbert, 117 S. Ct. at 1814. Since he was still receiving a substantial percentage of his pay, Townsend's interest in a prompt hearing was not as urgent as for an employee suspended or terminated with no pay whatsoever. Still, he would be entitled

to a reasonably prompt hearing.  Nevertheless, Townsend remained at the Central Office for almost 10 months without a hearing being held.  There is at least a factual dispute as to whether a reasonably prompt hearing would have occurred within that time period.  Cf. Bordelon v. Chicago School Reform Board of Trustees, 8 F. Supp. 2d 779, 788 (N.D. Ill. 1998); D'Acquisto v. Washington, 640 F. Supp. 594, 613-14 (N.D. Ill. 1986).  The Board's concerns about related liability would not justify postponing Townsend's hearing indefinitely.  And even if liability concerns were a sufficient justification for postponing the hearing, it does not justify Townsend being required to remain out of a teaching position for a period of time approximately ten times the length of his proposed suspension. He could have been returned to teaching until his hearing was held, and if not at Julian because of fears of community reaction, at another school.

Even if Townsend's reassignment is treated the same as a suspension with full pay, a due process claim is shown.  Townsend would still have been entitled to a hearing "at a meaningful time."  Loudermill, 470 U.S. at 547.  Even if suspended with full pay, an employee is entitled to a reasonably prompt hearing.  See Bordelon, 8 F. Supp. 2d at 788.  As previously set forth, it has not been indisputably shown that defendants acted with reasonable

promptness during the ten months of Townsend being removed from teaching.

Additionally, there is another theory on which Townsend's due process claim can succeed. In Levenstein, 164 F.3d at 351, the Seventh Circuit held that a medical school professor being forbidden from seeing patients and being assigned relatively menial tasks for an extended period of time was in essence an "extensive suspension" that constituted a constructive discharge for which the professor was entitled to a fair and adequate hearing instead of the sham hearing that occurred during his suspension.[12] Although Levenstein subsequently resigned, the Seventh Circuit holding is that he was entitled to due process at the time of his suspension. Levenstein "is arguing that the combination of the sham process and his extensive suspension amounted to a constructive discharge, and that the University defendants never gave him an adequate opportunity to respond to that action. This is very similar to the claim we recognized in Parrett v. City of Connersville, 737 F.2d 690, 694 (7th Cir. 1984), cert. dismissed, 469 U.S. 1145 (1985), in which this court held that a person could be effectively deprived of a property interest in a job by being relegated to the basement with no work to do." Levenstein, 164 F.3d at 351. Parrett had left open the

---

[12]There is also no indication that his salary was reduced during what the Seventh Circuit refers to as a suspension.

question of when the property deprivation occurs in a constructive discharge case, though it indicated that it could occur prior to an actual resignation. <u>Parrett</u>, 737 F.2d at 694 ("The precise dating of the constructive discharge is not important—provided it did not occur as soon as Parrett was transferred to the uniform force. For then there might have been no interval during which he had a property right that he could be deprived of . . . . But in any event his constructive discharge did not occur quite that immediately. Not until it became clear to him that he would not be given any work to do could he be said to have been constructively discharged. So long as the discharge did not occur immediately it is not important exactly when it did occur. Even if it was not till Parrett was hospitalized in April or took medical retirement in June, . . . .").

Defendants point to <u>Altman</u>, 734 F.2d at 1244, as holding that an employee suffering a constructive discharge has no loss of property until he or she actually resigns. First, that discussion is <u>dictum</u> as to the legal effect in the event the plaintiff had resigned, which he did not. Moreover, <u>Altman</u> is distinguishable because there the plaintiff had no protectible property interest because he could be transferred and disciplined in the manner that occurred without there having to be cause. Had he been discharged, though, cause would have been required and therefore there would have been a loss of property. In

Townsend's situation, though, his being transferred out of a certified position required cause even prior to any resignation. Thus, his situation is more like that in <u>Levenstein</u>, where the assignment of menial tasks constructively constituted an extended suspension for which cause was required.

<u>Swick</u> also contains <u>dictum</u> regarding constructive discharge. In reference to its alternative holding that a pecuniary loss is necessary for a property deprivation related to employment, the court states:

> Our position receives support from cases dealing with constructive discharge—cases in which an employer is deemed to have discharged an employee by making his life miserable. <u>Cain v. Larson</u>, 879 F.2d 1424, 1427 n.2 (7th Cir. 1989); <u>Parrett v. City of Connersville</u>, 737 F.2d 690, 694 (7th Cir. 1984). It is implicit in these cases that the actionable event is the discharge, not the petty harassments which may have cumulated to an unbearable level. <u>Cf. Townsend v. Indiana University</u>, 995 F.2d 691, 693 (7th Cir. 1993). Even if the harassments could be interpreted as a breach of an explicit or implicit employment contract, as the "suspension" of officer Swick might be interpreted as a breach of a term made part of his employment contract by the statute, they do not in themselves count as deprivations of property. Otherwise we shall be hearing appeals next in cases in which the public employer reneged on a promise to give the employee an office with a view, or a second secretary, or leave to coach a Little League team. <u>Brown v. Brienen</u>, 722 F.2d [360,] 364-65 [(7th Cir. 1983)].

<u>Swick</u>, 11 F.3d at 88. <u>Swick</u>, however, does not set forth when a property loss accrues, but instead emphasizes that the overall

effect of losing one's job, not the petty harassments leading up to the loss, is the actual property deprivation. Here, Townsend was removed from his certified position in April 1998. Essentially, in April 1998, Townsend was suspended from his teaching position, a suspension that required cause under applicable state law.

For the foregoing reasons, Townsend's procedural due process claim is not subject to dismissal. It still must be considered, though, whether Vallas and Johnson are entitled to qualified immunity. Qualified immunity protects government officials from individual liability for monetary damages as long as "their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Kitzman-Kelley v. Warner, 203 F.3d 454, 457 (7th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The burden is on Townsend to show that the pertinent legal principles were clearly established as of the pertinent dates. Kitzman-Kelley, 203 F.3d at 459. A Supreme Court decision on point will clearly establish the law. Burgess v. Lowery, 201 F.3d 942, 944 (7th Cir. 2000). Also, a Seventh Circuit decision on point ordinarily will clearly establish the law, but not if contrary decisions of other circuits or intimations in Supreme Court or Seventh Circuit cases not squarely on point raise enough doubt to justify a government official believing that a

particular right is not clearly established.  Id.  Conversely,
the absence of a Supreme Court or Seventh Circuit decision on
point does not conclusively show the law is not clearly
established.  Id. at 944-45.  It may be that the existence of the
right is so clear that the issue has never been litigated, or at
least never discussed in a published appellate court decision.
Id. at 945.  Also, absent a Seventh Circuit or Supreme Court
opinion on point, a generally consistent line of decisions from
other circuits can clearly establish a right.  Id.

Prior to April 1998, Illinois law was well established
that cause was required to remove a teacher from a certified
position.  See Hansen, 502 N.E.2d at 472; Bart, 632 N.E.2d at 42;
Newby, 368 N.E.2d at 1307; Lane, 348 N.E.2d at 472.  Federal law
was well established that removal for cause supports a
protectible property interest.  See Patkus, 769 F.2d at 1263;
Dusanek, 677 F.2d at 542.  See also Levenstein, 164 F.3d at 351.
In 1993, Swick, 11 F.3d at 87, held that there is no cognizable
property deprivation claim for a public employee absent a
pecuniary loss, but also held that such a loss may be an indirect
effect on income.  Thus, as of April 1998, it was well
established that Townsend's removal to the Central Office with no
teaching duties and an accompanying loss of coach's pay
constituted a deprivation of property entitled to due process
protections.

Prior to April 1998, it was well established that a public employee with a protectible property interest is entitled to a reasonably prompt hearing when threatened with a dismissal or suspension. See Loudermill, 470 U.S. at 546-47; Gilbert, 117 S. Ct. at 1814. The law was not well established as to how this rule applies when an employee is suspended with pay. It was certainly clear that some sort of time limit applies, a hearing at a meaningful time being one of the basic tenets of due process. Loudermill, 470 U.S. at 547. As previously discussed, though, Townsend was not suspended with full pay. Again, the precise parameters of a reasonably timely hearing in such a situation was not fully explicated in prior case law, but defendants present no significant justification for keeping Townsend removed from teaching for a longer period of time than his proposed suspension. A school official could not have reasonably believed that liability concerns and a fear of community reaction justified keeping Townsend removed from a teaching position anywhere in the school system and without a hearing where the liability concern would not have been implicated by returning Townsend to a teaching position and the community reaction concern would not have been implicated by providing a hearing or by returning Townsend to a certified position at another school. The individual defendants are not

entitled to qualified immunity on Townsend's procedural due process claim.[13]

The last claim to consider is Townsend's claim that he was a victim of retaliation for attempting to exercise his constitutional rights to due process. A person may not be punished for exercising constitutional rights, such as demanding due process procedures be provided. See Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 283-84 (1977); Levenstein, 164 F.3d at 352; Rubinovitz v. Corral, 60 F.3d 906, 910 (1st Cir. 1995).

Since Townsend does not have direct evidence of a retaliatory motive, he must rely on the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny. Townsend must first establish a prima facie case of retaliation. If he does so, the burden shifts to defendants to offer a legitimate and nonretaliatory reason for the adverse employment action. If defendants make this showing, the burden shifts back to Townsend to show that defendants'

---

[13]Also, Levenstein, 164 F.3d at 352, holds that university officials who, in 1995, constructively suspended a professor by placing him in a position with menial duties were not entitled to qualified immunity. Similarly, Vallas and Johnson would not be entitled to qualified immunity on the constructive discharge theory. And even if being able to bring a constructive discharge claim prior to being fully terminated from employment was not well established before Levenstein, Levenstein was issued on December 16, 1998 and Townsend continued to be held out of class and denied a hearing for approximately two more months after that.

proffered reason was pretext. Grottkau v. Sky Climber, Inc., 79 F.3d 70, 73 (7th Cir. 1996). At all times, the burden of persuasion remains with Townsend. Adreani v. First Colonial Bankshares Corp., 154 F.3d 389, 394 (7th Cir. 1998). To show that an employer's stated ground for an adverse employment action is pretextual, a plaintiff generally must present either direct evidence that an illegitimate ground was a motivating factor in the employer's decision or present a material factual dispute as to the sincerity of the proffered reason. See Collier v. Budd Co., 66 F.3d 886, 892 (7th Cir. 1995) (quoting Colosi v. Electri-Flex Co., 965 F.2d 500, 502 (7th Cir. 1992)). As to the latter, it must be shown (a) that the proffered reason had no basis in fact, (b) that the proffered reason did not actually motivate the decision, or (c) that the reason was an insufficient reason to motivate the adverse action. O'Connor v. DePaul University, 123 F.3d 665, 670 (7th Cir. 1997); McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 798 (7th Cir. 1997); Collier, 66 F.3d at 892 (quoting Cliff v. Board of School Commissioners of City of Indianapolis, Ind., 42 F.3d 403, 412 (7th Cir. 1994)).

To make out a prima facie case of retaliation for exercising constitutional rights, Townsend must show that (1) he sought to exercise constitutional rights; (2) he suffered an adverse employment action; and (3) that there is a causal connection between the two. See Mathur v. Board of Trustees of

<u>Southern Illinois University</u>, 207 F.3d 938, 941-42 (7th Cir. 2000); <u>Essex</u>, 111 F.3d at 1308. The third element can be satisfied by evidence of an adverse action occurring "fairly soon" after engaging in protected activity. <u>See</u> <u>Davidson v. Midelfort Clinic, Ltd.</u>, 133 F.3d 499, 511 (7th Cir. 1998).

The only evidence that Townsend points to regarding his attempting to exercise his claimed constitutional rights is his attorney's August letter invoking due process and demanding a return to Julian. The letter, however, was not received until August 27, after the school year had started. At that point, defendants had already failed to return Townsend to teaching at the beginning of the school year, as had previously been promised in July. Also, postponements of Townsend's hearing had occurred in June and July and, by July, it had already been decided to indefinitely postpone the hearing pending resolution of discovery in the wrongful death case. The only thing that occurred after August 27 was continued delay in returning Townsend to teaching. Thus, there was no significant change in Townsend's treatment subsequent to his invocation of his due process rights. This is not a circumstance where a retaliatory motive can reasonably be inferred. Townsend's retaliation claim will be dismissed.

This case may now be in a posture where settlement discussions would be fruitful, at least as regards Townsend.[14] A settlement conference will be set for June 14, 2000 at 10:00 a.m. The parties may be present, but are not required to attend as long as the attorney has sufficient settlement authority. By June 5, 2000, plaintiff shall submit a settlement demand to defendants and defendants shall respond no later than June 12, 2000. If, at the June 14 conference, settlement does not appear likely, a short date will be set for submission of the final pretrial order.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment [29-1] is granted in part and denied in part. The claims of plaintiff Riley are dismissed. Plaintiff Townsend's retaliation claim is dismissed. A settlement conference is set for June 14, 2000 at 10:00 a.m.

ENTER:

_William T. Hart_

UNITED STATES DISTRICT JUDGE

DATED: MAY 26, 2000

---

[14]To the extent the parties believe it would be useful to have settlement discussions as regards Riley as well, settlement of Riley's claim will also be considered.